UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| JIMMIE R. ROBINSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | No. 3:14-CV-235-PLR-CCS |
| | ) | REEVES/SHIRLEY |
| SHAWN PHILLIPS, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

This is a pro se prisoner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 [Doc. 1]. Petitioner also filed a memorandum in support of his § 2254 petition [Doc. 2]. Respondent filed a response in opposition thereto, as well as a copy of the state record [Docs. 14 and 16]. Petitioner filed a reply [Doc. 19]. Petitioner has also filed a motion to ascertain status of the case [Doc. 24] that will be **GRANTED** to the extent that this memorandum opinion and an order will enter. For the reasons set forth below, however, the Court determines that no evidentiary hearing is warranted in this case, Petitioner's § 2254 petition [Doc. 1] will be **DENIED**, and this action will be **DISMISSED.**

**I.    PROCEDURAL HISTORY**

On June 23, 2011, Petitioner entered a plea of guilty to a charge of second-degree murder [State Court Record, Exhibits 1 and 2 to Post-Conviction Hearing]. Petitioner did not appeal the resulting conviction, but did file a petition for post-conviction relief raising claims of ineffective assistance of counsel based on counsel's (1) failure to move for a change of venue, recusal of Sevier County judges, and disqualification of prosecutors; (2) failure to fully investigate the case;

(3) failure to inform Petitioner of the defense of necessity; (4) failure to inform Petitioner of a police/prosecution fabrication defense [State Court Record p. 48–75]; and (5) failure to inform Petitioner of all of the essential elements of the relevant offenses prior to his guilty plea [State Court Record, Amendment to Petition for Post-Conviction Relief]. Petitioner also raised claims based on allegations of suppression of exculpatory evidence and an allegation that his guilty plea was not knowing and voluntary due to the alleged ineffective assistance of counsel and/or judicial and prosecutorial misconduct [*Id.* at 75–88]. The state post-conviction court denied relief [State Court Record p. 121].

Petitioner appealed this denial to the Tennessee Court of Criminal Appeals ("TCCA"), raising claims for ineffective assistance of counsel based on allegations that counsel (1) raised a dishonest defense; (2) failed to prepare for trial; and (3) coerced Petitioner into a guilty plea [*Id.*, Brief of Appellant p. 4]. Petitioner also raised a claim that the post-conviction court erred by finding that Petitioner's guilty plea was made intelligent and voluntarily [*Id.*].[1] The TCCA affirmed the post-conviction court's denial of relief. *Robinson v. State*, No. E2013-01163-CCA-R3-PC, 2014 WL 1285502, at *7–9 (Tenn. Crim. App. March 31, 2015), *perm. app. denied* (Tenn. Aug. 26, 2014).

II. **BACKGROUND**

The following factual background is taken from the TCCA's opinion on Petitioner's appeal of the denial of his petition for post-conviction relief:

> The Petitioner pleaded guilty on June 23, 2011, to second[-]degree murder as a lesser included offense to the charged offense of first

---

[1] Petitioner also attempted to bring a pro se claim that he was not informed of the elements of first or second degree murder, but the TCCA held that claim was not properly before them. *Robinson v. State*, No. E2013-01163-CCA-R3-PC, 2014 WL 1285502, at *9 (Tenn. Crim. App. March 31, 2015).

degree premeditated murder. At the plea hearing, the State set forth the factual basis for the plea as follows:

> [T]he facts in this case the State would expect to prove are the following, first through Leah Brackins, the mother of the victim, James Jason Hicks.
>
> He was born in 1979 and grew up and in 2003 met Wendy Robinson, the [Petitioner's] daughter.
>
> Thereafter, he and Wendy had . . . three children. Ethan, born August 24, 2005, Samuel and Jake are twins born April 9, 2007.
>
> Subsequently, there was an order of protection filed by Ms. Robinson against the victim. Subsequently he filed a divorce. That case was pending and was a hotly contested divorce and custody dispute. That case was proceeding in both this court and the juvenile court until April 8 and 9 of 2009 when Judge Strand ordered that the victim, who had been separated from his children would be given the right to start . . . visitation.
>
> Thereafter, on April 19, according to the testimony of Ms. Brackins—well, actually on the 20th, she had went [sic] to her son's house and found him killed in his carport and driveway.
>
> Thereafter, Detectives Brown and Bush, along with Lieutenant Hinson of the Sevierville Police Department conducted an investigation. During the course of their investigation the body was autopsied. Dr. Steven Cogswell, who was the medical examiner at UT Hospital would testify that the victim died from three gunshot wounds to the head, two on the right side and one on the back left.
>
> The detectives investigated. They were able to locate several witnesses, including Marlene Forrester, and she would testify that the [Petitioner] made statements that he intended to ensure that the children would never see their father again. Allen Adams and Don McFalls would further testify that [the Petitioner] made statements along those lines. Mr. McFalls discovered a gun on the morning of April

3

> 20th in his car and it was arranged that that would be destroyed by him and that was in fact done and that would be his immunized testimony in this case.
>
> The detectives located projectiles, or a projectile. That was tested and compared with the projectiles found in the victim, and they matched.
>
> Taking all this information, the detectives were able to locate [the Petitioner]. [The Petitioner] made statements to them after being Mirandized implicating himself in this killing. As the Court is aware from a motions hearing, he stated his reasons for doing that.

At the evidentiary hearing on the Petitioner's claim for post-conviction relief, the Petitioner testified that he retained trial counsel to assist him in defending against the first[-]degree murder charge that the State brought against him. He retained trial counsel no more than two months prior to the scheduled trial date. He thought they met approximately five times. After the first several meetings, trial counsel claimed to have developed "a strategy that was not going to fail." The Petitioner testified that trial counsel wanted to conduct the case in a manner so as to allow the jury to conclude that the Petitioner's daughter had shot and killed the victim. The Petitioner refused to cooperate with this strategy "because it was not true." The Petitioner also was dissatisfied with trial counsel's attitude about the abuse that the Petitioner claimed that the victim had inflicted on the Petitioner's grandchild.

The Petitioner testified that, about six days before trial, there was a hearing that impacted negatively the Petitioner's defense of necessity. After the hearing, trial counsel told the Petitioner that he would have to take a plea bargain or he would "never get out of prison." Subsequently, they went to court, and the Petitioner signed the plea agreement at the podium. The Petitioner did not recall reviewing the agreement with trial counsel prior to signing it. The Petitioner did not recall trial counsel's explaining second[-]degree murder to him. He testified that trial counsel "always told me it [the facts of the case as related by the Petitioner] rose at best to manslaughter, two to six years." However, trial counsel did not explain the elements of manslaughter to the Petitioner, either.

4

The Petitioner recalled telling trial counsel that, right before the Petitioner killed the victim, the Petitioner's grandson asked him "if he would have to put [the victim's] pee-pee in his mouth again." According to the Petitioner, trial counsel's response to this reported conversation was, "that's too F-ing pat."

On cross-examination, the Petitioner acknowledged that he was not indicted and arrested for the killing of the victim until almost one year after he killed the victim. In the meantime, he had told the police that "there might be some bikers that had it out for" the victim. Ultimately, however, he confessed to the killing.

The Petitioner stated that he was sixty-seven years old at the time he entered his plea. He knew at the time he went to court on the day of the plea that he was going to plead guilty to second[-]degree murder and that he was going to be sentenced to seventeen and one-half years. He knew that he would be going to prison that day. He did not remember any specifics from the plea hearing because he was "in a fog."

Crystal Piarrot testified that, during the State's prosecution of the Petitioner, she had been employed with the Department of Children's Services ("DCS") as a child protective services investigator. She investigated a matter involving a child that was relevant to the Petitioner's prosecution. Trial counsel did not interview her.

On cross-examination, Piarrot stated that the victim was never charged with a crime.

On re-direct examination, she stated that a detective had been assigned to the case to determine if the victim should have been charged.

Trial counsel testified that he became licensed to practice law in 1996 and that his practice consisted solely of criminal defense work. He had significant trial experience with first degree murder cases. In this case, the State turned over extensive discovery to him. The discovery included materials about the divorce between the victim and the Petitioner's daughter and about the allegations of child abuse. Trial counsel acknowledged that he did not talk to Piarrot, explaining that he had two reasons for not doing so. First, he did not believe that she would be allowed to testify. Second, he had been "led to believe there was a criminal history there, and that's not a good witness." Trial counsel, however, did have access to Piarrot's records.

Trial counsel stated that his initial trial strategy was "heat of passion" resulting from the Petitioner's discovery that the victim had abused one of the Petitioner's grandsons. However, trial counsel became aware of several significant weaknesses with this strategy. First, over one year had elapsed between the Petitioner's discovery of the alleged abuse and the shooting. Second, "the way the shooting took place," i.e., the way the Petitioner hid, waited, and then shot the victim while the victim was talking on the phone. Third, the Petitioner previously had arranged for a third person to destroy the murder weapon, and the third person had admitted to doing so after the shooting. Fourth, the Petitioner initially told police that someone else was responsible for the killing. Finally, another significant problem was the Petitioner's videotaped statement to the police in which he was "cool, calm, and collected" and in which he told the police that he committed the crime because he was "sick of the system." In light of these difficulties with the initial strategy, trial counsel discussed with the Petitioner an alternate strategy of giving the jury an opportunity to consider that the Petitioner had confessed in order to protect his daughter, whom witnesses had described as very distraught before the murder and then, before the murder was discovered, was described as having undergone a "remarkable change in her demeanor" and who was saying, "don't worry, it's all going to be okay." The Petitioner and his family rejected this approach.

Trial counsel testified that he explained the elements of first degree premeditated murder to the Petitioner. Trial counsel stated that the facts as relayed by the Petitioner to him constituted premeditation: "we have a one to two hour lying in the dark watching the victim, contemplating shooting his head off . . . . And, secondly, having gone ahead of time to a friend and saying if I do this I need to get rid of the gun and then doing that." Trial counsel also explained second degree murder and voluntary manslaughter to the Petitioner. Trial counsel also explained the penalties for each of these crimes.

After the Petitioner rejected the defense strategy of blaming the Petitioner's daughter, trial counsel returned to the necessity of the Petitioner's testifying about why he shot and killed the victim. Trial counsel remained concerned that the jury would convict the Petitioner of premeditated murder because the State had uncontroverted proof that there had been no confrontation between the Petitioner and the victim before the Petitioner shot the victim multiple times in the head. Trial counsel also referred to the videotaped police interview in which the Petitioner confessed,

testifying that "[t]he [Petitioner] himself admitted standing there in the dark waiting an hour or two and then shooting him."

Shortly before trial, there was a hearing about (1) whether the Petitioner would be able to testify about what he believed had happened to his grandchildren and why he killed the victim and (2) whether the State would be able to impeach the Petitioner with his prior convictions. Trial counsel testified that the trial court ruled in the Petitioner's favor as to both issues. Trial counsel also stated that the trial court's ruling allowed him to strike a favorable plea bargain for the Petitioner. In discussing the plea offer with the Petitioner and the Petitioner's family, he told the Petitioner that, if they went to trial, they would lose. He testified,

> I told them, if the jury follows the law, it will be first degree [murder]. If we can convince one or two or three, they might trade down and we'll get second. If we get second, you're going to get twenty-five. You are going to get twenty-five years . . . .The Court is going to hammer you. You have a prior record. The deception for a year, the trying to blame other people . . . . [T]he use of a firearm.

The ultimate sentence agreed to was based on the possibility that the Petitioner would serve fifteen years and then be able to get out and see his grandchildren. Trial counsel discussed the sentence in detail with the Petitioner, and the Petitioner agreed to the plea bargain. The next day, at the plea hearing, the Petitioner was, according to trial counsel, "very strong, showed a lot of character, back straight, spoke up, went forward with dignity, I thought. Conducted himself very, very well." Trial counsel testified that he went over the written plea agreement with the Petitioner before the hearing. He also testified that, if the Petitioner had changed his mind, trial counsel was ready to go to trial.

On cross-examination, trial counsel stated that he did not interview any of the State's witnesses, nor did he have an investigator interview any of them. He stated, "there was no reason to. I knew what had happened from my own client." He also had the State's witnesses' statements, which conformed to the facts as he knew them. He did not seek a change of venue, in spite of the Petitioner's request, because he did not think it would be granted.

When asked if the Petitioner informed him about an event with his grandchild that was closer in proximity to the shooting and that would have been relevant to a heat-of-passion defense, trial counsel responded as follows:

> I recall telling [the Petitioner] that if he had shot him within three or four days I would walk him on probation. I remember telling him that. And I remember telling him that there was a real, real problem, and the problem was that it appeared that they were losing the court battle for custody and that when they got word they were going to lose, that that's when this all started to happen. And I remember telling him . . . that something has to drive you in the heat of passion. Okay? And up until then his entire conversations were about the system and the judges and the this and the that. There was never any mention of what [the grandson] had said recently. When I directly pointed out that that was going to be a real problem, the next day he came and said, I remember [my grandson] told me, I don't want to go there because I'm afraid he's going to make me, you know, put his pee-pee in my mouth or something like that. I didn't believe that for a second. He manufactured that because he realized I had just told him we didn't have a trigger. And so the next day he provided me the trigger.

Piarrot was re-called in rebuttal, and she testified that she voluntarily resigned from the DCS in April 2011. She stated that she resigned because she and her husband were leaving Tennessee. She denied that she ever had been charged with anything criminal.

The Petitioner also testified in rebuttal. He stated that he had watched the victim for "maybe five [minutes], at the most" before shooting him. He reiterated that his grandson had spoken to him about his fears of his father, the victim, three hours before the shooting and that the Petitioner had so informed trial counsel.

At the conclusion of the hearing, the post-conviction court ruled from the bench as follows:

> [The Petitioner's] trial counsel ... is a highly qualified and experienced defense attorney. By his account, he has actually taken to jury trial over thirty-five first degree murder cases and represented defendants in

many, many others that did not go to trial. In this case, he was diligent in obtaining discovery materials, spent considerable time consulting with [the Petitioner], explored all possible avenues of defense, investigated the case, and was fully prepared to take the case to trial. He was faced with a difficult task, in that the evidence would have shown that the victim, Mr. Jason Hicks, was killed by three gunshot wounds to the head and that [the Petitioner] had admitted to shooting from essentially an ambush position. [The Petitioner] had made a very detailed videotaped confession of the offense.

On June 23rd, 2011, [the Petitioner] appeared in court and entered a plea of guilty to second degree murder and received an agreed sentence of seventeen and a half years. I refer to the transcript of that hearing, which has been filed here as Exhibit No. 1. This transcript shows that [the Petitioner] was fully advised of his rights by the Court. He clearly understood those rights and voluntarily, knowingly and intelligently waived his right to a jury trial and entered his plea of guilty. When asked if satisfied with [trial counsel's] representation, he replied, quote, absolutely, Your Honor, I am. He was given the opportunity to ask questions and make statements. He did go on to say in that hearing, again, this is in the transcript, a big part of why I am doing this is this needs to end for my family and for the other family. It's gone on too long and I'm sorry that all this had to happen. I'm just Grandpa. That's all I am. Whatever comes, comes. And I respect this Court, I respect you, and I believe this has all been honest.

Besides stating his personal motivation for entering the plea, this shows that he was very clear, he understood all of the circumstances, he understood the procedure, and was making a voluntarily and intelligently made decision. [The Petitioner] was fully informed and advised by counsel of the ramifications of the plea agreement. Counsel met with family members. [The Petitioner] met with his family members. He considered the plea offer overnight and then appeared in court the next day.

> The Court must find that he was fully advised, fully informed by counsel, who had fully prepared, adequately prepared, and that the plea was his own voluntary decision to waive his right to a trial by jury and proceed with the plea agreement. The Court further finds [trial counsel] was thorough. He prepared himself fully for trial, was well-versed with all of the issues, considered all possible trial strategies, even some that were rejected by [the Petitioner], and in all respects performed well above the standards of reasonably effective defense counsel, and was in no way deficient. Thus, [the] [P]etitioner has failed to carry his burden of proof on the first prong of the two-prong test, and the Court must conclude to the contrary that [trial counsel's] representation was at the highest level of standards of defense counsel.
>
> Having failed to meet the first prong of the test, the Court need not address the second part, but if I did, it's clear that [the Petitioner] was in no way prejudiced in this case. Counsel made no errors. His advice was spot on. [The Petitioner] faced a potential life sentence. The evidence against him was overwhelming. [The Petitioner] served himself well by entering into and accepting the plea agreement.
>
> It is therefore the finding of this Court that [the Petitioner] has failed to carry his burden of proof, that his plea of guilt was knowingly and voluntarily made, that his counsel was very effective and met the highest standard of his profession, and therefore the petition for post-conviction relief is hereby dismissed.

*Robinson v. State*, 2014 WL at *1–6 (footnote omitted).

### III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), codified in 28 U.S.C. § 2254, *et. seq.*, a court considering a habeas claim must defer to any decision by a state court concerning the claim, unless the state court's judgment: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as

determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1)–(2).

The § 2254(d) standard is a hard standard to satisfy. *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (noting that "§ 2254(d), as amended by AEDPA, is a purposefully demanding standard . . . 'because it was meant to be'") (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)). Further, where findings of fact are supported by the record, they are entitled to a presumption of correctness which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## IV. ANALYSIS

Petitioner's § 2254 habeas corpus petition [Doc. 1] raises various grounds for relief, some of which Petitioner has procedurally defaulted. The Court will address the procedurally defaulted claims before addressing the remaining claims in turn.

### A. **Procedurally Defaulted Claims**

First, Respondent argues that many of Petitioner's arguments are procedurally defaulted. Specifically, Respondent asserts that Petitioner has procedurally defaulted the following claims by not raising them in his appeal of the denial of his petition for post-conviction relief:

1. Petitioner's claim for ineffective assistance of counsel based on the failure to move for change of venue, recusal of judge, and/or disqualification of judge and prosecutor;

2. Petitioner's claim for ineffective assistance of counsel based on the failure to investigate the case legally and factually and to inform Petitioner that his conduct met the elements of voluntary manslaughter;

3. Petitioner's claim for ineffective assistance of counsel based on the failure to inform Petitioner of the defense of necessity;

4. Petitioner's claim for ineffective assistance of counsel based on the failure to inform Petitioner of the defense of police/prosecution fabrication;

5. Petitioner's claim for ineffective assistance of counsel based on the failure to inform Petitioner of the intent element of second-degree murder; and

6. Petitioner's claim that the prosecution suppressed exculpatory material.

A petitioner who fails to raise his federal claim in the state courts and who is now barred by a state procedural rule from returning with the claim to those courts has committed a procedural default. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991). A procedural default forecloses federal habeas review, unless a petitioner can show cause to excuse his failure to comply with the state procedural rule and actual prejudice resulting from the alleged constitutional violation, *id*. at 732, or where the Petitioner demonstrates that he has "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496, 106 (1986).

An attorney's ineffective assistance in post-conviction proceedings generally does not establish "cause" to overcome procedural default of claims. *Coleman*, 501 U.S. at 755(1991). Where a 2254 petitioner could raise a claim for trial counsel's ineffective assistance for the first time in a post-conviction petition, however, ineffective assistance of post-conviction counsel may be "cause" to excuse the procedural default of such a claim. *Wallace v. Sexton*, 570 F. App'x 443, 452–53 (6th Cir. 2014); *Trevino v. Thaler*, 133 S.Ct. 1911, 1918–21 (2013); *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012). This exception applies in Tennessee. *Sutton v. Carpenter*, 745 F.3d 787, 792–95 (6th Cir. 2014). Where a petitioner alleges ineffective assistance of post-conviction counsel to establish cause to excuse his default of an ineffective assistance of trial counsel claim and alleges that the ineffective assistance or post-conviction counsel occurred only on appeal of his post-conviction petition, however, this exception does not apply, as the appeal was not the first time the petitioner could have raised the claim. *Wallace*, 570 F. App'x at 453.

As set forth above, Petitioner did not raise the above-listed claims in his appeal of the denial of post-conviction relief.[2] While Petitioner asserts that this omission resulted from the ineffective assistance of post-conviction counsel, this allegation is not sufficient to overcome this procedural default. Moreover, Petitioner has not demonstrated that he is actually innocent of second-degree

---

[2] To the extent that Petitioner's TCCA appellate brief raised the substance of Petitioner's § 2254 arguments regarding counsel's failure to inform him of the defense of necessity and/or that his conduct amounted to voluntary manslaughter, the record establishes that the TCCA determined that the trial court credited counsel's testimony that "Petitioner's claim that he killed the victim to protect his grandchild would likely not convince a jury because of the amount of time that had passed between the Petitioner learning of the allegations of abuse and the murder, the Petitioner's arrangements to destroy the murder weapon, the manner of the killing, the Petitioner's initial attempts to blame others, and the Petitioner's explanation to the police that he had killed the victim because he was 'sick of the system,'" *Robinson*, 2014 WL at *8, and that this testimony was supported by the record. As such, the TCCA reasonably determined that counsel was not deficient in his trial preparation or in seeking a plea bargain for second-degree murder. *Id.*

Under Tennessee law, the defense of necessity requires proof that the defendant "reasonably believes the conduct is immediately necessary to avoid imminent harm; and (2) The desirability and urgency of avoiding the harm clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness." Tenn. Code Ann. § 39-11-609 (2006). This defense applies "in exceedingly rare situations where criminal activity is 'an objectively reasonable response to an extreme situation.'" *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Ct. Crim. App. 1998) (quoting the Sentencing Commission Comments to Tenn. Code Ann. § 39-11-609).

Further, voluntary manslaughter is an "intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211. Second-degree murder, however, is a "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1)(2003).

Given the totality of the circumstances surrounding Petitioner's crime, the fact that the record establishes that the trial court credited Petitioner's counsel's testimony at the post-conviction hearing by finding that counsel "spent considerable time consulting with [Petitioner], explored all possible avenues of defense, [and] investigated the case," and that Petitioner was "fully informed by counsel" regarding the guilty plea [State Court Record, Transcript of Post-Conviction Hearing p. 138–39], and the fact Petitioner has set forth no evidence to contradict these findings, the record does not support finding that counsel was deficient for not informing Petitioner of the defense of necessity and/or not telling Petitioner that his conduct amounted to voluntary manslaughter. As such, Petitioner is not entitled to relief for these claims.

murder. Accordingly, Petitioner's above-listed claims are procedurally defaulted and they will be **DISMISSED**.

### B. Validity of Guilty Plea

Petitioner also that his guilty plea was not knowing, intelligent, and/or voluntary, but rather the result of "fraud, deception, duress, ignorance, misrepresentation, misunderstanding, and improper coercion, as well as based upon the prosecution's suppression of exculpatory evidence, judicial misconduct, and absent the [sic] effective assistance of counsel" [Doc. 1 p. 21]. The only related argument Petitioner presented in his appeal of the denial of his petition for post-conviction relief, however, was his claim that the plea was invalid because counsel "was deficient by overriding Appellant's opportunity to be informed and make his own decision about his case" based on the assertion that counsel only told Petitioner that he had "no defense [and] that [they] were going to get [their] *sses kicked" [State Court Record, Brief of Appellant p. 13–14 (quoting the transcript of the post-conviction hearing)]. Accordingly, for the reasons set forth above, this claim for ineffective assistance of counsel is the only claim that is not procedurally defaulted and the Court will therefore address only this claim.

The Supreme Court has explained that "[a] plea of guilty is more than a confession which admits that the accused did various facts; it is itself a conviction; nothing remains but to give judgment and determine punishment." *Boykin v. Alabama*, 395 U.S. 237, 242 (1969). Because of the consequences stemming from a guilty plea, a plea-taking court must ascertain that the plea is voluntary and knowing and that it is being proffered with sufficient awareness of the relevant circumstances and the probable and direct consequences of a plea. *Brady v. United States*, 397 U.S. 742, 748–49 (1979).

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. A defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687. Petitioner has the burden of showing both deficient performance and prejudice. *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000).

Under the first prong of the test, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A defendant asserting a claim of ineffective assistance must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong requires the petitioner to show that counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the

15

judgment." *Strickland*, 466 U.S. at 691. In the context of a guilty plea, to prove the prejudice prong of his claim, a petitioner must show a reasonable probability that, but for counsel's deficient performance, he would not have pleaded guilty and would have insisted on going to trial. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). "A reasonable probability is a probability sufficient to undermine confidence in the outcome, *Strickland*, 466 U.S. at 694, and it "requires a substantial, not just conceivable, likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (citation and internal quotation marks omitted).

While both prongs must be established to meet a petitioner's burden, if "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at 697. Also, review of a *Strickland* claim under § 2254(d)(1) is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S.Ct. 1411, 1420 (2009). Further, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable," but instead "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011).

The TCCA found that the record supported the post-conviction court's ruling that Petitioner entered his guilty plea knowingly, voluntarily, and intelligently. *Robinson v. State*, No. E2013-01163-CCA-R3-PC, 2014 WL 1285502, at \*9 (Tenn. Crim. App. March 31, 2015). The TCCA specifically held that the post-conviction court had credited[3] the trial testimony of counsel that he "reviewed the plea bargain offer with the Petitioner and explained the consequences of the

---

[3] Habeas courts generally defer to trial court credibility findings, as the trial court is in the best position to determine witness credibility. *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003); *see also Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (holding that § 2254 does not give habeas courts "license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them").

deal . . . . [and] advised the Petitioner of what he considered to be the likely consequence of a trial." *Id*. The TCCA further noted that despite the strong proof that Petitioner had committed premeditated first-degree murder, counsel had negotiated a guilty plea for second-degree murder, that this plea allowed Petitioner hope of being released during his lifetime, that Petitioner was given a night to think about the offer and to consider it with his family, and that Petitioner had voiced no concerns about the plea or trial counsel at the plea hearing.[4] *Id.* As such, the TCCA found that Petitioner had not demonstrated that the guilty plea violated Petitioner's unconstitutional rights.

The record supports the state courts' finding that counsel was not deficient with regard to explaining the plea agreement to Petitioner and that Petitioner entered the guilty plea freely, intelligently, and voluntarily. Moreover, the Court is not in a position to second-guess the post-conviction court's determinations on credibility. As such, Petitioner is not entitled to relief on this claim.

## V. CONCLUSION

As set forth above, Petitioner's motion to ascertain status of the case [Doc. 24] will be **GRANTED** to the extent that this memorandum opinion and an order will enter.

For the reasons set forth above, however, the Court finds that none of Petitioner's claims warrant issuance of a writ. Therefore, Petitioner's petitions for a writ of habeas corpus [Doc. 1] will be **DENIED** and this action will be **DISMISSED.**

---

[4] To the contrary, Petitioner stated that he was "absolutely" satisfied with his counsel's representation at the plea hearing [State Court Record, transcript of plea agreement hearings, p. 9]. Petitioner further specifically expressed that he was pleading guilty in part because he wanted the ordeal to end for his friends and family [*Id.* at 13].

17

## VI. CERTIFICATE OF APPEALABILITY

The Court must consider whether to issue a COA, should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas proceeding only if he is issued a COA, and a COA may only be issued where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack*, 529 U.S. at 484.

After reviewing each of Petitioner's claims, the Court finds that Petitioner has not made a substantial showing of the denial of a constitutional right as to any claims. Specifically, as the procedurally defaulted claims, jurists of reason would not debate the Court's finding that the claims are procedurally defaulted. Further, as to the claim that Petitioner did not procedurally default, jurists of reason would not debate the Court's finding that counsel was not deficient in not explaining the guilty plea to Petitioner. Accordingly, a COA **SHALL NOT ISSUE**.

**AN APPROPRIATE ORDER WILL ENTER.**

**ENTER**:

_____
**UNITED STATES DISTRICT JUDGE**